John CHITWOOD, and Barbara Chitwood, Plaintiffs-Respondents,†

v.

A.O. SMITH HARVESTORE PRODUCTS, INC., Defendant-Appellant,

A.O. SMITH CORPORATION, Dodgeland Harvestore, Edward Bartolemei, Robert Carl Shoemaker, Maryland Casualty, and Tower Insurance Company, Inc., Defendants.

Court of Appeals

*No. 90-0292. Oral argument October 17, 1991.—Decided August 20, 1992.*

(Also reported in 489 N.W.2d 697.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Michael A. Schumacher* of *Herrick, Hart, Duchemin, Danielson & Guettinger, S.C.* of Eau Claire and *Donald E. Egan, Bonita L. Stone* and *Mark L. Johnson* of *Katten Muchin & Zavis* of counsel of Chicago, Illinois and orally argued by *Bonita L. Stone.*

For the plaintiffs-respondents the cause was submitted on the brief of *Charles A. Bird* of *Bird & Jacobson* of Rochester, Minnesota and *James R. Koby* of La Crosse and *William Mahler* of Rochester, Minnesota and *Karen Fowell* of Richland Center and orally argued by *Charles A. Bird.*

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

DYKMAN, J. A.O. Smith Harvestore Products, Inc. ("Harvestore Products" or "the company"), appeals from an order denying its motions for judgment notwithstanding the verdict, to change verdict answers and for a new trial. The issues are: (1) whether the trial court properly ordered a jury trial after the plaintiffs failed to timely pay the jury fee; (2) whether the trial court erred in admitting evidence of representations made by a dealer's salesman; (3) whether plaintiffs proved justifiable reliance on the company's misrepresentations; (4) whether plaintiffs proved a causal connection between the misrepresentations and consequential damages; (5) whether the trial court's instruction on benefit of the bargain damages was erroneous; and (6) whether the trial court erred by admitting evidence of lost profits over a twenty-five-year period.

We conclude that the trial court had the discretion to allow a jury trial notwithstanding the waiver, and that it properly exercised this discretion. In addition, we find that the trial court did not err in admitting evidence of the salesman's representations or the plaintiffs' lost profits. Furthermore, we conclude that the plaintiffs offered credible evidence of justifiable reliance on the misrepresentations and of a causal connection between the misrepresentations and their consequential damages. However, we conclude that the trial court erroneously instructed the jury on both benefit of the bargain and consequential damages and therefore, we remand the cause for a new trial on these issues.

John and Barbara Chitwood brought this action in 1985. They are dairy farmers in Blue River, Wisconsin. The complaint alleged that in 1979, they purchased a silo and related equipment, known together as a Harvestore. The Harvestore was manufactured by A.O. Smith Harvestore Products, Inc., a subsidiary of A.O. Smith

Corp. The Harvestore was sold to the Chitwoods by Dodgeland Harvestore, Inc., of Dodgeville, Wisconsin. Defendants Edward Bartolemei and Robert Shoemaker were alleged to be employees of Dodgeland, and the named insurance companies were alleged to be insurers of Dodgeland or its employees. The Chitwoods alleged that the Harvestore failed to function as promised. They sought recovery on several theories.

Before trial, defendants Dodgeland, Bartolemei, Shoemaker and the insurance companies settled and were dismissed. Some of the Chitwoods' theories were dismissed by summary judgment. Their claims of conspiracy, intentional misrepresentation and strict responsibility against Harvestore Products and A.O. Smith Corp. were tried to a jury in 1989. The jury found by special verdict that there was no conspiracy and that Harvestore Products had intentionally misrepresented. The jury did not decide strict responsibility. It awarded the plaintiffs $425,000 in compensatory damages. The trial court denied the company's motions after verdict, and it appeals.[1]

## I. PAYMENT OF JURY FEE

The company argues that the plaintiffs waived their right to a jury trial, that the trial court lacked discretion to order such a trial notwithstanding the waiver, and that the judgment must be vacated and a new trial granted. The Wisconsin Constitution provides the right to a jury trial: "The right of trial by jury shall remain

---

[1]The Chitwoods suggest that there may be a jurisdictional issue because the company did not timely appeal from a judgment that was vacated by the trial court. This suggestion is without merit because a vacated judgment is a nullity that cannot be appealed.

626

inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law." WISCONSIN CONST. art. I, § 5 (amended 1922).

Several statutes are also relevant. Section 805.01, Stats., provides in part:

> (2) Any party entitled to a trial by jury or by the court may demand a trial in the mode to which entitled at or before the scheduling conference or pretrial conference, whichever is held first. The demand may be made either in writing or orally on the record.
> (3) The failure of a party to demand in accordance with sub. (2) a trial in the mode to which entitled constitutes a waiver of trial in such mode. The right to trial by jury is also waived if the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury.

Section 814.61(4), Stats., provides that the clerk shall collect for a jury in all civil actions:

> a nonrefundable fee of $6 per juror demanded to hear the case to be paid by the party demanding a jury within the time permitted to demand a jury trial. If the jury fee is not paid, no jury may be called in the action, and the action may be tried to the court without a jury.

In 1989, the company moved to have the case tried to the court on the ground that the Chitwoods had waived their right to a jury trial. According to the court's decision on that motion, the plaintiffs demanded a jury trial to twelve jurors at a telephone scheduling conference on September 12, 1988. The court entered a sched-

627

uling order for such a trial to start in July 1989. On June 12, 1989, the court informed the parties that the plaintiffs had not paid the jury fee. The plaintiffs did so, and the defendants moved for trial to the court.

The court concluded that failure to pay the fee at or before the scheduling conference, as required by sec. 814.61(4), Stats., waived the Chitwoods' right to a jury trial. The court further concluded, however, that it had the discretion to relieve the plaintiffs from the failure and allow them to pay the fee late, and it did so. We denied the defendants' petition for leave to appeal from a nonfinal order.

On appeal, Harvestore Products argues that the plaintiffs waived their right to a jury trial and that the trial court did not have discretion to order such a trial despite this waiver.

■

Assuming, without deciding, that the trial court correctly ruled that the plaintiffs waived their right to a jury by failing to timely pay the fees under sec. 814.61(4), Stats., we conclude that the court had discretion to allow a jury trial. The provisions of ch. 801, Stats., govern procedures in civil actions. Section 801.01(2), Stats. Section 801.15(2)(a), Stats., provides:

> When an act is required to be done at or within a specified time, the court may order the period enlarged but only on motion for cause shown and upon just terms . . .. If the motion is made after the expiration of the specified time, it shall not be granted unless the court finds that the failure to act was the result of excusable neglect. The order of enlargement shall recite by its terms or by reference to an affidavit in the record the grounds for granting the motion.

Although the trial court did not expressly rely on this provision, it is applicable here. We regard the plaintiffs' late payment of the fee and their opposition to the defense motion for a trial to the court as a motion for enlargement of the time. Because it came after the expiration of the specified time, the court was required to find that the failure to act was the result of excusable neglect. In its memorandum decision, the court noted that the scheduling conference was conducted by telephone and none of the lawyers were actually in the courthouse to pay the jury fee. It found that it did not appear that the plaintiffs' conduct was in any way motivated by a desire to delay the case. Although it did not use the term "excusable neglect," such a finding is implicit in the court's analysis.

The court satisfied the requirement that it recite the grounds for the enlargement. It wrote that the case is complex, includes a demand for punitive damages, and is of a type that would normally be tried to a jury. It noted that the failure to pay the fees was raised by the court, and no party would be prejudiced because all had been preparing for a jury trial. We conclude that the court did not abuse its discretion in allowing the late payment of the jury fee.

Even if we were to conclude that the trial court improperly ordered a jury trial, however, that would still not compel a reversal of the judgment. Section 805.18(2), Stats., provides:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding . . . for error as to any matter of . . . procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has

629

affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

The company has not shown how its substantial rights were affected by trial to a jury rather than to the court. In denying the company's petition for leave to appeal, we stated that if the company prevailed on the jury fee issue in a postjudgment appeal, the remedy would probably be to order the trial court to make findings and conclusions based on the evidence presented to the jury. The defendants do not argue that the trial court would be likely to make more favorable findings than the jury.

## II. INTENTIONAL MISREPRESENTATION

Harvestore Products argues that the plaintiffs failed to prove certain elements of intentional misrepresentation, and that therefore, the trial court erred by not granting its motions to change answer, or for a new trial.[2] Motions challenging the sufficiency of the evi-

---

[2]Section 805.14(5), Stats., provides in relevant part:

(b) A party against whom a verdict has been rendered may move the court for judgment notwithstanding the verdict in the event that the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment.

(c) Any party may move the court to change an answer in the verdict on the ground of insufficiency of the evidence to sustain the answer.

Section 805.15, Stats., provides in relevant part:

(1) A party may move to set aside a verdict and for a new trial because of errors in the trial, or because the verdict is contrary to law or to the weight of evidence, or because of excessive or inadequate damages, or because of newly-discovered evidence, or in the interest of justice.

dence may be granted only if, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of that party. Section 805.14(1), Stats. The company also argues that the trial court erred by admitting certain evidence and in its jury instructions.

The elements of intentional misrepresentation are: (1) a false representation of fact; (2) made with intent to defraud and for the purpose of inducing another to act upon it; and (3) upon which another relied and was induced to act, resulting in injury or damage. *D'Huyvetter v. A.O. Smith Harvestore Products,* 164 Wis. 2d 306, 320, 475 N.W.2d 587, 592 (Ct. App. 1991). Generally, the false representation must relate to present or preexisting facts and cannot be merely unfulfilled promises or statements of future events. *Id.*

The plaintiffs' theory, in brief, was that the defendants represented to them that the Harvestore silo was "oxygen-limiting," would be labor-saving, and would lead to higher quality feed for their herd, resulting in higher production, less need for protein supplements, and higher profits. They were told that limiting the amount of oxygen coming into contact with the feed would reduce spoilage. They alleged that these represen-

---

The company also argues, on the same grounds, that the court should have granted its motion for judgment notwithstanding the verdict. However, because the company's arguments challenge the sufficiency of the evidence or errors at trial, a motion for judgment notwithstanding the verdict is inappropriate. *See Herro v. DNR,* 67 Wis. 2d 407, 413, 227 N.W.2d 456, 461–62 (1975) (motion does not challenge sufficiency of evidence to support facts found in verdict, but whether facts found in the verdict are sufficient to permit recovery).

tations were untrue and that the Harvestore gave them inferior feed that caused nutritional problems in their herd, leading to health problems, reduced production and other damages.

## A. *Admission of Statements by Dodgeland Salesman*

Harvestore Products argues that certain statements made by an employee of Dodgeland were not admissible against it and therefore cannot support a judgment against it. The company argues that the admission of this evidence "inextricably tainted" the verdict. The company further argues that even if the statements were properly admitted, they were not actionable because they were opinions that did not pertain to present or preexisting facts.

### 1. *Admission of Shoemaker Statements*

Mrs. Chitwood was asked on direct examination to describe what Shoemaker, a salesman for Dodgeland, told her to expect from the Harvestore. Defense counsel objected on several grounds. In responding to the objection, plaintiffs' counsel noted that Shoemaker was an employee of Dodgeland and that Dodgeland was an exclusively authorized Harvestore dealership at the time. Defense counsel replied that he was looking through the complaint and that he did not see any agency claim there, and that if there was such a claim, there had not yet been a foundation laid that Shoemaker or Dodgeland was an authorized agent acting on behalf of the defendants. He pointed out that although Dodgeland had been released as a defendant, the plaintiffs were trying to make their case against the released party and imply that that party's actions were those of the remaining defendants.

Plaintiffs' counsel said that Shoemaker's statements to Mrs. Chitwood were consistent with training and educational materials provided to him by the defendants, and that plaintiffs' offer of this evidence was subject to being linked with what the defendants had instructed Shoemaker to say and with representations that the defendants made directly to the Chitwoods.

The court observed that the product was made by the defendant and bought from a dealer, and that the evidence surrounding the transaction had to be admitted. The court continued:

> If in fact later on in this trial it appears that Mr. Shoemaker and Dodgeland Harvestore were acting totally without authority and were off on some frolic of their own, then we can strike it and probably strike along with it some causes of action. But at least the way it stands now, I think it should be admissible . . ..

After further discussion, the court said:

> If it is shown that [Shoemaker] was acting under the authority[,] through Dodgeland Harvestore[,] of [Harvestore Products], I think it could be an admission against [Harvestore Products], but that I agree is subject to further being linked up.
>
> Just for the clarity of taking a case in a logical order, I don't think we have to get that agency business done now. If the agency isn't proven, though, I will hear a motion to strike and I would strike it.

After still more argument, the court observed that either the evidence would come in later in a way that would confuse the jury, or it could come in at that time,

> knowing that there may be some problems with admissibility, but subject to being stricken, if it can-

not be shown . . . that [Shoemaker] was an agent through Dodgeland [of Harvestore Products].

I would suggest that if you could show that, that that's probably going to dispose of a large part of the lawsuit. But that's in the future.

Suspecting that more evidence of Shoemaker's statements would probably be offered, the court said it would note a continuing objection to such evidence but would admit it.

Several days later, responding to Harvestore Products' objection to the admission of advertisements or materials prepared by Dodgeland, the court stated:

I have been admitting things that Dodgeland Harvestore and Dodgeland people did in making their sales and I think we went into this a couple days ago . . .. Some of these things, if for some reason the plaintiffs are unable to lay sufficient foundation with Mr. Shoemaker and other people, it could be stricken. But I have been admitting them on the grounds that the testimony will come in from those people, so I will admit [this exhibit].

On appeal, the company objects to Mrs. Chitwood's testimony that Shoemaker said their herd's milk production would increase, protein supplementation would be eliminated or reduced, and the Harvestore would be maintenance-free, pay for itself and be labor-saving. The company argues that the statements of a Dodgeland agent are not binding on it, and the burden is on the plaintiff to prove otherwise. It argues that it is undisputed that Shoemaker was paid only by Dodgeland, not the company, and that Dodgeland was a separate corporation. It argues that because of the lack of an agency relationship between the company and Shoemaker, his statements cannot be imputed to it.

634

The Chitwoods argue that intentional misrepresentation does not require an agency relationship, but that fraud made through a third person is actionable as long as the plaintiffs were within the group sought to be affected by the misrepresentations. They rely on the RESTATEMENT (SECOND) OF TORTS §§ 533 and 534 (1977),[3] and evidence showing that Shoemaker's statements to the Chitwoods were based on educational and training materials provided by Harvestore Products. The plaintiffs also argue that even if agency was necessary, the evidence establishes it.

We must reject the Chitwoods' arguments about fraud through a third party and the establishment of agency because the jury did not receive instructions on either a third-party fraud or agency theory which would allow it to find Harvestore Products liable for Shoemaker's statements. It may be that with such instructions, the jury would have found fraud through a third party or an agency relationship. However, we cannot

---

[3]RESTATEMENT (SECOND) OF TORTS §§ 533 and 534 (1977) state:

§ 533.

 ⸗ The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

§ 534.

 One who makes a fraudulent misrepresentation intending or with reason to expect that more than one person or class of persons will be induced to rely on it, or that there will be action or inaction in more than one transaction or type of transaction, is subject to liability for pecuniary loss to any one of such persons justifiably relying upon the misrepresentation in any one or more of such transactions.

make such findings. *See Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 n.3 (1980).

Nevertheless, the company's argument must also be rejected. That argument is about whether certain evidence should have been admitted. For the admission of evidence to be held reversible error, there must have been an objection when the evidence was offered. Section 901.03(1)(a), Stats. Here, there was an objection on the ground that no agency theory had been alleged or established.[4] The trial court overruled the objection, but it stated several times that if agency were not established, the court would grant a motion to strike the evidence.

So far as we can determine, the defendants never made such a motion. In fact, during closing argument, counsel for Harvestore Products briefly described Shoemaker's statements and asserted that they were not untrue. If, by the close of evidence, the defendants still believed that the plaintiffs had failed to prove agency, it was incumbent upon them to move to strike the evidence admitted subject to that proof. It may be that the defendants decided there were more urgent matters to attend to at that point. It may also be that, rather than prompting the plaintiffs to ask for an agency instruction, the defendants gambled that the Shoemaker evidence would not hurt them as much as an agency instruction. Either way, we conclude that the company waived its

---

[4]The objection relating to agency was actually made by counsel for A.O. Smith Corp., while counsel for Harvestore Products focused more on a hearsay analysis. We assume that Harvestore silently joined in the agency objection. If it did not, then we must conclude that Harvestore Products did not object to admission, ending our analysis.

objection by not making the motion to strike suggested by the court.

### 2. *Actionability of Dodgeland Statements*

The company further argues that even if the Dodgeland statements were properly admitted, they were not actionable because they were opinions that did not pertain to present or preexisting facts. We concluded above that the jury verdict did not include a finding of agency or fraud through a third party because it was not instructed on those theories. Therefore, Dodgeland's statements may not be used to support the verdict against Harvestore Products, since the jury could not properly have used those statements in reaching that verdict. Because we may not use Dodgeland's statements to support the verdict, whether those statements were actionable is irrelevant.

In addition to the statements by Dodgeland employees, the jury also heard evidence of representations made directly by Harvestore Products to the Chitwoods through various promotional materials. The company does not argue that without the Dodgeland statements, the verdict against it is not supported by credible evidence, and we do not address that issue.

### B. *Justifiable Reliance*

The company argues that the Chitwoods did not prove that they justifiably relied on its representations. Because we have concluded that there was no instruction allowing the jury to link Harvestore Products with statements by Dodgeland employees, we may consider only whether the Chitwoods justifiably relied on representations made to them directly by Harvestore Products.

637

The company argues that the Chitwoods' asserted reliance on the representations that the Harvestore was "oxygen-limiting" was contradicted by their other testimony. That testimony included their knowledge that oxygen entered the silo when the top or bottom doors were opened during feeding or filling.

However, Mrs. Chitwood testified that before they bought the Harvestore, she was told, and it was her understanding, that oxygen would not come in contact with the feed. The jury could have inferred from this testimony that she relied on that understanding in purchasing the product. Mr. Chitwood testified that he was shown promotional materials and told that the Harvestore would be oxygen-limiting. He said he relied on these representations in purchasing the Harvestore. Both had seen advertising materials prepared by the company. It is not contradictory for the Chitwoods to know that some oxygen gets into the silo and to also believe that the Harvestore admits less oxygen than a standard silo. We conclude that the finding of reliance is supported by credible evidence.

The company also argues that the Chitwoods' reliance on statements that their dairy production would be enhanced was not justified because of all of the variables that can affect such production and the Chitwoods' own doubts about the claims. We need not address this argument. The jury need not find that the plaintiffs relied on every misrepresentation in order for the company to be liable. The jury's finding of justifiable reliance is adequately supported by the reliance on the "oxygen-limiting" representations.

## C. *Causation*

The company argues that the plaintiffs' theory of causation was not supported by the evidence. That theory was that oxygen in the silo caused the feed to suffer damage from mold and heat caused by chemical processes. This damage reduced the nutritional value of the feed or caused cows to reject it, resulting in bovine nutritional deficiencies, health problems and reduced milk production.

Specifically, the company argues that the plaintiffs failed to prove the feed was heat-damaged because they submitted only a few feed samples from the nine-year period that they used the Harvestore. However, the plaintiffs' expert testified that thirty out of these thirty-eight samples showed evidence of heat damage. The samples covered a broad time period. The jury could have inferred from this credible evidence that these samples indicated frequent heat damage.

The company argues that because the plaintiffs did not establish the condition of the feed before it was placed in the Harvestore, they failed to prove that the feed was actually damaged there. However, Mr. Chitwood testified that he had experience with feed and he knew that it was good feed going in. This is credible evidence of the condition of the feed before storage.

The company also argues that the plaintiffs failed to establish that their herd's health problems were nutritionally related. It argues that some of the health problems in the herd had other causes and that a multitude of factors can affect the herd's health and production. However, the plaintiffs' expert testified that the herd's health problems were caused by feed stored in the Harvestore. This testimony serves as credible evidence

that the herd's health problems were nutritionally related.

## D. *Damages*

Harvestore Products argues that the Chitwoods failed to prove damages. Two kinds of damages are recoverable in an intentional misrepresentation action: benefit of the bargain and consequential. The jury awarded $275,000 for loss of the benefit of the bargain and $150,000 as consequential damages.

### 1. *Benefit of the Bargain Damages*

The defendants argue that the trial court erred in its instruction on benefit of the bargain damages and that the evidence does not support the jury's award. The Chitwoods argue that benefit of the bargain damages measure how the plaintiffs would have been better off if the representations made by the seller had come true. They argue that the best evidence of how they would have been better off is their own testimony and the testimony of their expert, Dr. Michael Behr. Behr is an agricultural economist. The plaintiffs describe his analysis as follows:

> First of all, Dr. Behr outlined an assessment of the Chitwood expected milk production had Harvestore never been on the farm. Secondly, Dr. Behr calculated expected increase in profit based upon representations as to product performance and capability as outlined in [materials provided by Harvestore Products and Dodgeland]. This was "benefit of the bargain" damage which measured their expected increases over and above where the Plaintiffs should have been without Harvestore . . .. [Dr. Behr] opined that the Chitwoods lost, based upon where they

should have been without Harvestore, $334,984.00. He estimated the representation losses at $234,849.00.

Respondent's brief at 16–17 (record references omitted). Behr's projections began in 1979, when the Chitwoods purchased the Harvestore, and ended twenty-five years later, in 2004.

The jury instructions on benefit of the bargain damages were modeled on Wis J I—Civil Nos. 3735 and 3725, which ordinarily relate to contract cases. The instructions stated in part:

3735 Damages:

The measure of damages for the plaintiffs' loss of bargain is the amount which will compensate the plaintiff for the loss suffered because of the misrepresentations of the defendant. A party who is injured should, as far as it is possible to do by monetary award, be placed in the position in which he would have been had there been no misrepresentations . . .. A party is not entitled to be placed in a better position because of the misrepresentation than he would have been had there been no misrepresentations. The injured party is entitled to the benefit of his agreement, which is the net gain he would have realized from the transaction but for the misrepresentation of the other party.

3725 Damages: Future Profits

The loss of prospective or future profits is a proper basis for awarding damages resulting from a misrepresentation when the circumstances are such that the future damages may be computed with some reasonable certainty . . ..

. . ..

Loss of future profits is to be determined by you as of the date of the misrepresentation.

■ This instruction was incorrect. Benefit of the bargain damages for intentional misrepresentation measure the difference between the value of the property as represented and its actual value as purchased. *D'Huyvetter,* 164 Wis. 2d at 322-23, 475 N.W.2d at 593. The plaintiffs argue that the term "value" in this context is not limited to fair market value, but that "value" can be viewed in terms of utility. They argue that the best evidence of such value is an estimate of what would have happened if the representations were true.

Although many Wisconsin cases discussing benefit of the bargain damages use only the term "value," and not "fair market value," it is apparent that market value is the concept being applied. This is expressly stated in *Kimball v. Antigo Bldg. Supply Co.,* 261 Wis. 619, 621, 53 N.W.2d 701, 702 (1952). The standard jury instruction on benefit of the bargain damages for intentional misrepresentation calls for a measurement of the "difference between the fair market value of the property in its condition when purchased by [the plaintiff] and the fair market value of the property," if it had been as represented. Wis J I—Civil 2405. This measurement does not allow consideration of the gains the buyer could have realized if the product had performed as represented.

In *D'Huyvetter,* the jury awarded an amount greater than was supported by the evidence. It was apparent, however, that it had intended to award the maximum possible benefit of the bargain damages. We reviewed the record, determined what amount was supported by credible evidence, and ordered the court to award that amount. 164 Wis. 2d at 323-24, 475 N.W.2d at 593. We

would follow that same procedure here, but, for reasons discussed below, we conclude that we cannot.

## 2. *Consequential Damages*

Consequential damages may be recovered if proven with reasonable certainty. *See Gyldenvand v. Schroeder,* 90 Wis. 2d 690, 698, 280 N.W.2d 235, 239 (1979).

The company argues that Behr's testimony projecting the success of the Chitwoods' business should not have been admitted because so many other factors can affect a farm's profits that his analysis was too speculative. We reject this argument because the company failed to timely object to Behr's testimony. The morning after Behr's direct examination, defense counsel objected to admission of the testimony about future representations, which he claimed had been barred by an order in limine. Counsel said, "I freely admit [this] blew right past me . . .." The court concluded that regardless of any pretrial order, it was counsel's duty to object at the proper time, and that the defense waived the objection by failing to object. The court also noted that if the testimony did not go to an appropriate item of damages, that could be covered in the jury instructions.

During the discussion of the instructions on damages, the defense asked that a date be set after which damages would become speculative, and that the jury be instructed that it could not award damages after that point. The defense also objected to the use of the term "future profits," believing that this would lead the jury to believe it should award damages forward from the time it made its decision. The trial court rejected these suggestions.

The instruction stated in part:

> The law provides that a person who has been damaged by misrepresentation shall be fairly and reasonably compensated for his loss. In determining the damages, if any, you will allow an amount that will reasonably compensate the injured person for all losses that are the natural and probable results of the misrepresentation.
>
> As part of consequential damages you may award a sum for lost profits, if the plaintiffs in fact had less profit from their farming operation than they would have had if they had not purchased the [H]arvestore. You should not include in your answer to this question any amount for loss of expected profits based on an expectation that the farm would be more profitable with the addition of the [H]arvestore.

A trial court has broad discretion when instructing a jury. *White v. Leeder,* 149 Wis. 2d 948, 954, 440 N.W.2d 557, 559 (1989). Therefore, unless the trial court abused its discretion in instructing the jury, we may not reverse the jury's determination of consequential damages. *See First Wis. Nat'l Bank of Oshkosh v. KSW Inv., Inc.,* 71 Wis. 2d 359, 364, 238 N.W.2d 123, 126 (1976).

The defendant's objections to the instructions raise substantially the same issue as its argument that Behr's testimony should not have been admitted: whether the jury was allowed to consider evidence on consequential damages that was too speculative. We conclude that it was.

Behr submitted a study of the Chitwoods' consequential damages, and he testified that he considered the fire in his calculations. But Behr did not explain how the silo, after its destruction, caused any further loss to the Chitwoods. After the fire, the Chitwoods sold their remaining cattle. There could be no further loss of production from a nonexistent herd caused by a nonexistent

silo. We conclude that the destruction of the silo prevented further damages from accruing.

We conclude that the trial court exceeded its discretion by failing to impose a time limit on the consequential damages that could be awarded. That issue must be retried, and the jury instructed that damages may not be awarded for the period after the fire.

### 3. *Benefit of the Bargain and the Jury Instructions*

We concluded our discussion of benefit of the bargain damages above by stating that we could not follow the procedure we used in *D'Huyvetter* to order an award. We cannot because, unlike *D'Huyvetter,* we are uncertain whether the jury intended to award the maximum amount of benefit of the bargain damages possible.

Our uncertainty arises from the jury instructions in this case. As shown by the parts of the instructions quoted above, the jury was told that it could award lost or future profits as part of both benefit of the bargain and consequential damages. Although the jury was also instructed not to duplicate damages, we conclude that these instructions permit duplicative damages.

To avoid duplicate damage awards on retrial, the trial court should limit benefit of the bargain damages to the difference between the fair market value of the property in its condition when purchased and the fair market value of the property if it had been as represented, which is the standard stated in *Kimball* and Wis J I—Civil 2405.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded.