STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd W. TIMBLIN, Defendant-Appellant.

Court of Appeals

*No. 02–0275–CR. Submitted on briefs September 26, 2002.—
Decided November 20, 2002.*

2002 WI App 304

(Also reported in 657 N.W.2d 89.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Alex Flynn* of *Alex Flynn & Assoc., S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Maura FJ Whelan*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Todd W. Timblin appeals from a judgment of the circuit court convicting him of six counts of felony theft contrary to WIS. STAT. § 943.20(1)(d) (1999–2000).[1] Timblin argues that he

---

[1] WISCONSIN STAT. § 943.20 provides in relevant part:

**(1)** ACTS. Whoever does any of the following may be penalized as provided in sub. (3):

. . . .

(d) Obtains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

. . . .

**(3)** PENALTIES. Whoever violates sub. (1):

. . . .

(c) If the value of the property exceeds $2,500, is guilty of a Class C felony.

All references to the Wisconsin Statutes are to the 1999–2000 statutes unless otherwise noted.

should be permitted to withdraw his guilty pleas because he was not able to make a knowing waiver of his rights since the information was defective as to counts 15 and 18. In the alternative, he argues that because the court failed to inform him of the agency element required for counts 15 and 18, he should be permitted to withdraw his pleas. We disagree with both of Timblin's arguments. The circuit court's judgment is affirmed.

¶ 2. On July 24, 2000, a twenty-one count criminal complaint was filed, claiming that Timblin had committed theft by deception in violation of WIS. STAT. §§ 943.20(1)(d) and (3)(c) and 939.50(3)(c). The first eleven counts were premised on acts occurring before January 1, 2000, thus alleging violations of the 1997–98 statutes. The rest of the counts were premised on acts occurring in 2000; these counts alleged violations of the 1999–2000 statutes and were subject to determinate sentencing under the truth-in-sentencing regime.

¶ 3. A preliminary hearing was held on October 9, 2000, and November 3, 2000. At the hearing, several witnesses testified providing sufficient evidence for the trial court to find probable cause. The following represents the evidence testified to at the preliminary hearing. Timblin befriended David Lichtensteiger approximately three years before approaching Lichtensteiger with an "investment opportunity" in March or April 1999. Timblin said that the state of Florida was ready to accept applications for seven riverboat gambling licenses. He said he planned to file three applications for the licenses and expected some or all of these to be granted. Timblin told Lichtensteiger that each application would cost $500,000 and that anyone who invested in the licenses would get a full refund of his or her money if the applications were unsuccessful. Timblin

explained that if the three licenses were granted, he would sell them to the Las Vegas-based "Mandelay Bay Group" with an anticipated profit of $37 million dollars.

¶ 4. Lichtensteiger spoke to several other people in his social circle about Timblin's investment plan, including Mark Matenaer, Bob Brodie, Gerry Mueller, William Russell, Wendy and Chad Graff, and Douglas and Kathy Graff. All of these people eventually became "investors" in Timblin's "investment opportunity."

¶ 5. Sometime in the fall of 1999, Timblin informed Lichtensteiger that he had been awarded the three licenses he had applied for. Timblin then gave Lichtensteiger reasons as to why he had to delay giving the investors a share of the purported profits. First, he said there was a sixty-day delay attributable to a protest filed by gambling opponents. Later, he said that the licenses were issued only once a year and that the next issuance date was April 4, 2000.

¶ 6. During the months spent waiting for the purported licenses to be issued, Timblin successfully got the investors to turn over more money to him. In August 1999, Timblin falsely claimed that he had purchased a gambling boat and convinced the investors to give him the extra money he needed to pay for it. In October 1999, Timblin informed Lichtensteiger that another unnamed and unrelated investor was seeking a judgment against Timblin for $250,000; Timblin then explained that if that investor did not get paid, the licenses would be lost because an applicant could not have judgments against him.[2] Lichtensteiger spoke to the other investors about this problem, and they came up with $225,000 to help Timblin avoid judgment.

---

[2] We note that the chronology we summarize is mostly based on Lichtensteiger's testimony at the preliminary hearing,

¶ 7. In January 2000, Timblin told Lichtensteiger he needed $50,000 to live on for awhile. Lichtensteiger obtained a personal check for that amount—payable to Todd Timblin—from Chad and Wendy Graff, signed by Wendy. Lichtensteiger delivered the Graffs'[3] check to Timblin on January 14, 2000. The criminal complaint stated that this check was intended to "alleviate defendant's financial troubles so that the deal for the riverboat gaming licenses would not fall through." This last transaction was the basis of count 15 of the information.

¶ 8. In January or February, Timblin told Lichtensteiger and Matenaer—who between them passed Timblin's information to the rest of the investors—that $354,000 had to be sent to someone named Bill Rossi in Florida or there was "a chance we could lose the whole investment." Included in the money the investors raised for Timblin at this time was a personal check for $50,000—payable to Todd Timblin—signed by Wendy Graff from the account of Graff Masonry, Inc. Lichtensteiger delivered it to Timblin. The criminal complaint stated that this money was paid "for the purpose of making payments to individuals to facilitate issuance of the riverboat gamin [sic] licenses." This transaction was the basis of count 18 of the information.

¶ 9. On April 4, 2000, Lichtensteiger and the other investors learned that "we weren't going to receive the licenses after everything was all done and that. And we were told we'd receive our money back but it would be 90 days."

which varies somewhat from another "investor's" testimony. This is not significant because in substance the testimonies support one another.

[3] The "Graffs" who are referred to from here on are Wendy and Chad Graff.

¶ 10. In May 2000, Timblin informed Lichtensteiger and Matenaer that he felt pressured to file for bankruptcy. He explained to them that such an action would necessarily affect their investment because, he said, when the investment money finally came back from Florida, "[I]t will no doubt have to go through bankruptcy court. And it's going to mean that you guys are going to lose out on a good chunk of your investment." Timblin said that their investment money was due back from Florida on or around June 19. He explained that to avoid filing for bankruptcy before collecting the money, he would "need about $20,000 to get caught up on back payments and for some living expenses." The investors came up with just under $20,000 right before Memorial Day.

¶ 11. In July, Timblin informed Matenaer of another round of difficulties with recouping the investment. Timblin said that he had gone to the airport to meet a man, "Anthony," who was to deliver the cashier's check from the state of Florida for $1.8 million, which represented the money put in by the investors and by Timblin himself. Timblin said that Anthony informed him that he would not hand over the check unless Timblin gave him $100,000 in cash. Timblin eventually asked the investors to come up with the money that Anthony demanded. After Matenaer told Timblin that the money was not available, Timblin said that Anthony would take $50,000 now and $50,000 later, or he would even take only $25,000 now and the rest later. The investors did not come up with the money and they never got their investment money back.

¶ 12. Matenaer suggested to Timblin that they call the FBI in to deal with Anthony. The next morning, Timblin met with Matenaer and a couple of the other investors and said that "Anthony says that if you guys

get the [FBI] involved, houses will burn to the ground with people in them. Every last one of you."

¶ 13. At some point, the Washington County Sheriff's Department became involved. Investigating Detective Michael Rindt interviewed Timblin regarding his role in what was now an alleged theft of over $1 million dollars from various investors. At that time, Timblin admitted obtaining approximately $700,000 to $800,000 from various individuals, including Lichtensteiger, Matenaer, and the Graffs. Timblin told Rindt that he intended to invest the money on their behalf but denied any knowledge about a scheme to secure riverboat gambling licenses from the proceedings. Timblin acknowledged that he had deposited the checks he was given into his personal checking account. He said that all of this money was used to cover Las Vegas gambling debts.

¶ 14. Subsequently, an updated information was filed on December 13, 2000. The information charged the original twenty-one counts and three additional counts. Two additional theft by deception counts were added, as well as a charge of felony intimidation of a victim in violation of Wis. Stat. §§ 940.43(3) and 939.50(3)(d).

¶ 15. On June 13, 2001, Timblin pled guilty to six counts of theft by deception—three pre-truth-in-sentencing and three post-truth-in-sentencing. The remaining counts were to be dismissed and read in for purposes of sentencing. The court accepted Timblin's pleas.

¶ 16. Timblin agreed that the court could use the facts stated in the criminal complaint and the preliminary hearing as a factual basis for his pleas. The court explained the six elements of the crime of theft by

deception to Timblin and offered to let him review the corresponding Wisconsin Jury Instruction, an offer that Timblin declined.

¶ 17. A sentencing hearing was held on August 8, 2001. At that time, upon the representation of Timblin's lawyer that serious efforts were being made to provide restitution to the victims, the court agreed to postpone sentencing until September 14, 2001. Timblin did not provide restitution to the victims by the rescheduled sentencing hearing. Two days before sentencing, Timblin, represented by a new attorney, moved to withdraw his guilty pleas. Timblin argued that the complaint and information were defective because the two counts involving the Graffs, counts 15 and 18 of the information, did not allege an agency relationship. He further concluded that even if the complaint and information were not defective, the plea colloquy was. He claimed that because the trial court did not advise him that the existence of an agency relationship was an element of the crime, he was entitled to withdraw his pleas. Specifically, his motion argued that he was not able to make a knowing waiver of his rights "[d]ue to the defects in the criminal complaint and information, the plea colloquy with the defendant, misstated the elements of the crimes contained in Counts 15 and 18 of the information . . . ."

¶ 18. The court denied Timblin's plea withdrawal motion at the sentencing hearing and sentenced him to eight, nine and nine years on the three pre-truth-in-sentencing counts, to be served concurrent to any other sentence. On the three post-truth-in-sentencing counts, Timblin was sentenced to three identical consecutive sentences of fifteen years each—the first five years to be served in confinement, to be followed by a ten-year term

of extended supervision. In total, fifteen years in confinement followed by thirty years of extended supervision. Timblin appeals.

¶ 19. The decision to accept conviction via a voluntary plea is a grave and solemn act and should not be lightly treated. *State v. Damaske*, 212 Wis. 2d 169, 191, 567 N.W.2d 905 (Ct. App. 1997). Nevertheless, prior to sentencing, a motion to withdraw a guilty plea should be freely allowed if the defendant presents a "fair and just reason" to justify the withdrawal. *State v. Garcia*, 192 Wis. 2d 845, 861, 532 N.W.2d 111 (1995). "But 'freely' does not mean automatically. A fair and just reason is some 'adequate reason for defendant's change of heart . . . other than the desire to have a trial.' " *Id.* at 861–62 (citation omitted).

¶ 20. While the "fair and just" reason test is a liberal test, the defendant must still demonstrate a "genuine misunderstanding of the plea's consequences" or "haste and confusion in entering the plea" or "coercion on the part of trial counsel." *State v. Shimek*, 230 Wis. 2d 730, 739, 601 N.W.2d 865 (Ct. App. 1999). It is within the trial court's discretion to determine whether a defendant's reason adequately explains his or her change of heart. *State v. Kivioja*, 225 Wis. 2d 271, 284, 592 N.W.2d 220 (1999). We review a trial court's discretionary decision under the erroneous exercise of discretion standard. Thus, we will uphold a discretionary decision if the circuit court reached a reasonable conclusion based on the proper legal standard and a logical interpretation of the facts. *Id.*

309

█

¶ 21. On appeal, Timblin claims that the trial court erred in not allowing him to withdraw his pleas. He asserts that there was not a factual basis for his pleas because the complaint and information were required to establish an agency relationship given that the Graffs learned of Timblin's investment plan through Lichtensteiger and gave their money to Lichtensteiger to deliver to Timblin. He claims that since he was not made aware that the State would have to prove that Lichtensteiger was the Graffs' agent, his pleas were not knowing.

¶ 22. He first contends that WIS JI—CRIMINAL 1453, the jury instruction for WIS. STAT. § 943.20(1)(d), demonstrates his proposition that "agency is one of the elements of the crime of theft by fraud when the accused obtains another person's property through an intermediary." Timblin then quotes only the following portion of the instruction:

> (The owner of the property involved in this case is (corporation) (other) and the State claims that the representation was made to (agent of owner of property). If you find beyond a reasonable doubt that the defendant made a false representation to an (officer) (employee) (agent) of (name owner of property), then you should also find that the defendant made a false representation to the owner of the property.)

This part of the jury instruction addresses cases where agency is the basis for the claim of theft by fraud[4]—it

---

[4] The directions, which immediately precede the part of the jury instruction Timblin relies upon, state: ["GIVE FOLLOWING WHEN REPRESENTATION WAS GIVEN TO OWNER'S AGENT."]

does not shed light on *when* agency *must* be the basis for the claim of theft by fraud, as Timblin would have us believe.

¶ 23. Timblin also contends that the requirement to prove agency in "this kind of theft by fraud" has been recognized in *State v. Kennedy*, 105 Wis. 2d 625, 314 N.W.2d 884 (Ct. App. 1981). *Kennedy* held that where the defendant defrauds a principal by deceiving the principal's agent, the existence of the agency relationship is itself an element of the offense. *See id.* at 632–33.

¶ 24. *Kennedy* addressed the fraudulent billing procedures of a psychiatrist. *Id.* at 628. Kennedy submitted claim reports to Surgical Care Blue Shield, the fiscal agent in Milwaukee county for Wisconsin's medical assistance program. *Id.* The State filed suit after an investigation indicated that Kennedy submitted eighty-seven fraudulent claims for "individual psychiatric examinations." *Id.* The trial court instructed the jury that it could find Kennedy guilty of theft by fraud if it found, inter alia, that Kennedy had deceived Surgical Care Blue Shield and defrauded the State of Wisconsin. *Id.* at 632. Kennedy argued that such an instruction could not be given unless the jury found that Surgical Care Blue Shield was an agent of Wisconsin. *Id.* We agreed but concluded that the instruction as given required the jury to find an agency relationship in order to find Kennedy guilty. *Id.* at 632–33. We also held that the information did not fail to charge theft by fraud because it identified Surgical Care Blue Shield as the agent of the State of Wisconsin. *Id.* at 632. The jury found Kennedy guilty of theft by fraud. *Id.* at 629.

¶ 25. *Kennedy* is distinguishable from the case at bar. There we agreed with the defendant that the jury had to find an agency relationship between Surgical

311

Care Blue Shield and the State of Wisconsin in order to find the defendant guilty. Timblin argues that under *Kennedy*, Lichtensteiger was the Graffs' agent because the Graffs learned of Timblin's plan through Lichtensteiger and gave their money to Lichtensteiger to deliver to Timblin. We believe that more is required to make agency an element in a theft by fraud case.

¶ 26. We do not view Lichtensteiger as having functioned as the Graffs' agent. True, he delivered the Graffs' money to Timblin, but this does not suffice to make him the Graffs' agent. The State of Wisconsin in *Kennedy* turned over the management of its money, assumedly via contract, to Surgical Care Blue Shield. Unlike the State of Wisconsin, the Graffs self-managed their money. They maintained control over decisions on *when* to turn over their money and maintained control over decisions to *whom* to give their money.

¶ 27. Moreover, an agency relationship exists only when there has been a manifestation to establish that agency. *Kohl v. F. J. A. Christiansen Roofing Co.*, 95 Wis. 2d 27, 33–34, 289 N.W.2d 329 (Ct. App. 1980). Whether an actual principal-agent relationship exists usually turns on facts concerning the understanding between the alleged principal and agent. *Johnson v. Minn. Mut. Life Ins. Co.*, 151 Wis. 2d 741, 748, 445 N.W.2d 736 (Ct. App. 1989). The relationship exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 15 (1957)).

¶ 28. The RESTATEMENT (SECOND) OF AGENCY further clarifies the agency relationship:

> An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.

RESTATEMENT (SECOND) OF AGENCY § 12 (1958). The commentary elaborates:

> *Power.* The phrase "power of an agent" denotes the ability of an agent or apparent agent to affect the legal relations of the principal in matters connected with the agency or apparent agency. The exercise of this power may result in binding the principal to a third person in contract; in divesting the principal of his interests in a thing, as where the agent sells the principal's goods; in the acquisition of new interests for the principal, as where the agent buys goods for the principal; or in subjecting the principal to a tort liability . . . .

*Id.*, cmt. a.

¶ 29. There was no manifestation by the Graffs that Lichtensteiger was to act as their agent. Applying the language of the RESTATEMENT, the facts do not demonstrate that Lichtensteiger "[held] a power to alter the legal relations between" the Graffs and any third party, including Timblin. Furthermore, Lichtensteiger did not bind the Graffs to Timblin in contract, did not divest the Graffs of their money or acquire new interests on their behalf, and did not subject them to tort liability.

¶ 30. The Graffs divested themselves of their own money—Lichtensteiger did not. Lichtensteiger shared with the Graffs the news about Timblin's "investment opportunity." He repeated statements made by Timblin to the Graffs, and he delivered checks—signed by the Graffs, drawn from their own account and paid to the order of Timblin—to Timblin. Lichtensteiger was no more than a conduit between the Graffs and Timblin.

Agency might arguably be found if the Graffs had given Lichtensteiger cash or access to their checking account and asked him to make investment decisions on their behalf—but they did not. If that had happened, *Kennedy* might well control. However, that did not happen and there was no agency relationship.

¶ 31. Despite the fact that this is not an agency relationship, Timblin may dispute his responsibility for the Graffs' losses based on his claim that he did not speak directly to the Graffs. This argument is unpersuasive. Theft by deception is a species of fraud, which is addressed by civil tort law as well as criminal law. The RESTATEMENT (SECOND) OF TORTS[5] provides for civil liability for misrepresentation where it is foreseeable and intended that a fraudulent misrepresentation will be repeated to third parties and acted upon by them:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

RESTATEMENT (SECOND) OF TORTS § 533 (1977); *see also Chitwood v. A.O. Smith Harvestore Prods., Inc.*, 170 Wis. 2d 622, 635 n.3, 489 N.W.2d 697 (Ct. App. 1992).

---

[5] We have previously consulted the civil fraud standards of the RESTATEMENT as an aid to interpreting the criminal fraud statutes. *See State v. Mueller*, 201 Wis. 2d 121, 138–39, 549 N.W.2d 455 (Ct. App. 1996).

¶ 32. Thus, under the facts of this case, the trial court did not err in denying Timblin's motion to withdraw his guilty pleas. There was enough evidence to establish probable cause that the Graffs relied on the misrepresentations Timblin made to Lichtensteiger—representations that Timblin either intended or had reason to expect would be repeated to other existing or potential investors, including the Graffs. For example, by January 2000, when Wendy Graff signed the check on which count 15 was based, Timblin had already received money from various investors through Lichtensteiger and knew that there was a growing number of third-party investors. Additionally, it seems probable that Timblin intended Lichtensteiger to pass on the February 2000 statement he made, claiming that the funds supplied by all the investors would be in jeopardy if more money were not forthcoming.

¶ 33. We recognize that had Timblin decided to take this case to trial, he would have been entitled to put the State to its proof with respect to whether he should be held criminally liable for taking the Graffs' money. However, Timblin decided to plead guilty and he has not provided a "fair and just" reason to upset the trial court's acceptance of his pleas. He has not demonstrated a "genuine misunderstanding of the plea[s'] consequences" or "haste and confusion in entering the plea[s]" or "coercion on the part of trial counsel"; therefore, we will not upset the discretionary decision of the trial court to deny Timblin's motion to withdraw his guilty pleas. *See Shimek,* 230 Wis. 2d at 739.

*By the Court.*—Judgment affirmed.