**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 5, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP1835**

Cir. Ct. No. **2023CV80**

STATE OF WISCONSIN

**IN COURT OF APPEALS**
**DISTRICT III**

TAMRA SCHOTT,

   PETITIONER-RESPONDENT,

V.

WISCONSIN DEPARTMENT OF HEALTH AND HUMAN SERVICES,

   RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Lincoln County: GALEN BAYNE-ALLISON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

¶1    STARK, P.J.  In this case, Tamra Schott challenged the Wisconsin Department of Health Services' (DHS)[1] failure to provide her with notice and a

---

[1] The caption incorrectly names the Department of Health Services as the Department of Health and Human Services.

"fair hearing," pursuant to federal and state Medicaid law, after she was involuntarily discharged from a psychosocial rehabilitation program in Lincoln County (the County). The DHS argues that fair hearings are required only to determine "whether the State, acting through the [DHS], has incorrectly denied eligibility for Medicaid, has properly terminated or restricted Medicaid coverage for certain services, or has correctly denied coverage based on a lack of medical necessity." According to the DHS, the involuntary discharge decision in this case was a *provider* decision, and "[t]here is no 'fair hearing' mechanism for those kinds of treatment decisions by a provider."

¶2 The circuit court disagreed. It reversed an administrative law judge's (ALJ) decision concluding that Schott was required to exhaust her "local level" appeal right, through a hearing before the Bureau of Prevention, Treatment, and Recovery (the Bureau), prior to requesting a fair hearing before the DHS. The DHS now appeals from the circuit court's order, which determined that federal and state law entitle Schott to a fair hearing to determine whether her involuntary discharge from the psychosocial rehabilitation program was improper and awarded her attorney fees and costs.

¶3 For the reasons that follow, we affirm the circuit court's decision in all respects. Based on the circumstances in this case, the decision to involuntarily discharge Schott was not merely a provider decision. The decision was made by an entity to which the DHS has, by and through its own promulgated rules, delegated all authority to administer psychosocial rehabilitation programming in the County, and the decision was based on the direct execution of the DHS's own discharge rules, not the medical judgment of a provider. Therefore, we conclude, pursuant to federal and state law for Medicaid recipients, that Schott was entitled to a fair hearing to challenge her involuntary discharge from the program. We

further conclude that the DHS's denial of that fair hearing was not substantially justified and that the court therefore did not erroneously exercise its discretion by awarding Schott attorney fees and costs.

## BACKGROUND

¶4　In October 2022, Schott, a recipient of "Medical Assistance," otherwise known as Medicaid,[2] sought behavioral health services through the County. Schott applied for these services through a "comprehensive community services program" (CCS), *see* WIS. ADMIN. CODE § DHS 36.03(4) (July 2023)[3] (defining "CCS" as "a county-wide or tribal community-based psychosocial rehabilitation program that is operated by a county department or tribe to provide or arrange for the provision of psychosocial rehabilitation services"), which the County operates by contracting with a private entity called North Central Health

---

[2] *See* 42 U.S.C. § 1396; WIS. STAT. § 49.45 (2023-24) ("Medical assistance; administration"). "The Medicaid Program provides free or low-cost health care for low-income people, families, and children, pregnant women, the elderly, and people with disabilities." ***Papa v. DHS***, 2020 WI 66, ¶4, 393 Wis. 2d 1, 946 N.W.2d 17.

All references to the Wisconsin Statutes are to the 2023-24 version.

[3] All references to WIS. ADMIN. CODE ch. DHS 36 are to the July 2023 register unless otherwise noted.

Care (NCHC).[4]  It is undisputed that NCHC offers the only CCS program in the County.  Schott was found eligible, and NCHC began offering her CCS services.

¶5     On February 3, 2023, NCHC sent Schott a notice that she had been involuntarily discharged from CCS.  According to the notice, Schott was discharged because NCHC had "not been able to establish a treatment plan within the timeframe allowed for the abbreviated assessment."  The notice further informed Schott that "[y]ou have the right to appeal this decision" and directed her to "submit a written request for review of the determination of need for psychosocial rehabilitation services" to the Bureau.[5]  The notice did not advise Schott that she had a right to appeal her discharge before the termination of her CCS services ended.  The notice also did not advise her that she had a right to a fair hearing to challenge that action, nor did it provide her with notice of the procedures for a fair hearing.  *See* WIS. ADMIN. CODE § DHS 36.17(5)(am)3.[6]

---

[4] Wisconsin has opted to include CCS services as a benefit for Medicaid recipients. *See* WIS. STAT. §§ 49.45(30e), 49.46(2)(b)6.Lm.; WIS. ADMIN. CODE § DHS 36.01.  These psychosocial rehabilitation services "assist individuals with mental disorders or substance-use disorders to achieve the individual's highest possible level of independent functioning, stability and independence and to facilitate recovery."  WIS. ADMIN. CODE § DHS 36.03(22); *see also* § DHS 36.03(23) (defining "[r]ecovery").  The County offers social services to its residents through its Department of Social Services, which is "a governmental agency authorized by Wisconsin State Statutes, … under the direction of … the [DHS] and the State Department of Children and Families."  *Social Services Department*, LINCOLN COUNTY, WI, https://www.co.lincoln.wi.us/social-services (last visited Apr. 23, 2026).  Lincoln County, together with Marathon and Langlade Counties, holds a tri-county contract with NCHC to administer CCS services for residents.

[5] The Bureau is part of the DHS's Division of Care and Treatment Services.  WISCONSIN DEPARTMENT OF HEALTH SERVICES, DIVISION OF CARE AND TREATMENT SERVICES, https://www.dhs.wisconsin.gov/dcts/index.htm (last visited Apr. 23, 2026).

[6] WISCONSIN ADMIN. CODE § DHS 36.17(5)(am)3. (Feb. 2026) has been recently amended.  *See infra* note 21.

¶6 On March 3, 2023, Schott filed a request for a fair hearing, pursuant to WIS. ADMIN. CODE § DHS 104.01(5) (May 2023),[7] with the Division of Hearings and Appeals (DHA), challenging her involuntary discharge.[8] NCHC subsequently moved to dismiss Schott's request, arguing that she was "not entitled to a fair hearing when appealing a CCS program discharge decision" because NCHC is not "the agency or the department" and the discharge decision was a "provider" decision, not a Medicaid benefit or eligibility determination. According to NCHC, Medicaid beneficiaries "are only entitled to *notice* of [§] DHS 104.01(5) appeal procedures but are not expressly entitled to an appeal as a matter of right." NCHC argued that Schott first had to appeal to the Bureau. Schott disagreed, arguing that as a Medicaid recipient, she was entitled to pretermination notice that her Medicaid benefits would be discontinued, terminated, or suspended and was entitled to a fair hearing to contest that adverse action with sufficient time to appeal before the effective date.

¶7 An ALJ granted NCHC's motion to dismiss, concluding that the matter was "not ripe for appeal on the merits." According to the ALJ, "Wisconsin must maintain a hearing system for [Medicaid] that meets the requirements of the federal regulations," which means that the hearing system "must provide for a hearing before the [Medicaid] agency … or … an evidentiary hearing at the local level, with a right of appeal to the [Medicaid] agency." *See* 42 C.F.R. § 431.205 (2026).[9] The ALJ stated that Schott should have exercised her "local level appeal

---

[7] All references to WIS. ADMIN. CODE ch. DHS 104 are to the May 2023 register.

[8] Corporation counsel for Marathon County appeared on behalf of NCHC in the matter.

[9] As the relevant regulations have not materially changed since Schott was discharged, all references to the Code of Federal Regulations are to the 2026 edition.

right"—i.e., a review by the Bureau—"before filing with the DHA." The ALJ also concluded that the notice NCHC sent to Schott was deficient because our administrative code "require[s] that when the consumer receives [Medicaid], the notice of discharge must contain the fair hearing procedures prescribed in [WIS. ADMIN. CODE §] DHS 104.01(5)," but the notice Schott received "did not do so." Accordingly, the ALJ ordered NCHC to "issue a new notice of discharge to the petitioner containing the language required under WIS. ADMIN. CODE § DHS 36.17(5)(am)3."[10]

¶8      After the ALJ's decision, NCHC issued a new notice to Schott. This notice informed her that she had the right to appeal to the Bureau, but it also contained the following language:

> In addition to your right to appeal [to the Bureau], if you are a Medicaid Recipient you have the right to notice of the fair hearing procedures prescribed in [WIS. ADMIN. CODE §] DHS 104.01(5), which may apply in the event you receive an adverse decision after exercising the above appeal.

The notice then quoted the fair hearing procedures in § DHS 104.01(5).

¶9      Schott filed a petition for rehearing, arguing that the ALJ made material errors of law in her decision. According to Schott, requiring review by the Bureau was not consistent with applicable federal or state regulations for Medicaid recipients, which require a fair hearing. Schott also asserted that review by the Bureau was not a "local evidentiary hearing" as defined by federal regulations. *See* 42 C.F.R. § 431.205(b).

---

[10] There are two decisions on the motion to dismiss in the administrative record. One decision was issued on May 8, 2023, and one decision was issued on May 10, 2023, which vacated the first decision.

¶10 The ALJ denied Schott's petition for rehearing. The ALJ's denial was generally based on her adoption of NCHC's arguments, and she provided the following basis for the denial in the order:

> Under WIS. ADMIN. CODE § DHS 36.17(5)(am)3., [Medicaid] beneficiaries who are involuntarily discharged from the [CCS] program are only entitled to a *notice* that contains the fair hearing procedures under WIS. ADMIN. CODE § DHS 104.01(5).... "The fair hearing process is not intended for recipients who wish to lodge complaints against *providers* concerning quality of services received, nor is it intended for recipients who wish to institute legal proceedings against *providers*. Recipients' complaints about quality of care should be lodged with the appropriate channels established for this purpose, to include but not limited to provider peer review organizations, consumer advocacy organizations, regulatory agencies and the courts."

¶11 Schott then petitioned for judicial review of the ALJ's decision before the circuit court. In addition to the above arguments, Schott also argued that the ALJ's decision to impose an exhaustion requirement—i.e., an appeal before the Bureau before pursuing a fair hearing—"in the absence of any authority" was inconsistent with state regulations and would constitute impermissible rulemaking.

¶12 After briefing on Schott's petition, the circuit court held a nonevidentiary hearing and issued an oral ruling, later memorialized by written order, reversing the ALJ's decision and remanding the case to the DHA for a fair hearing proceeding to determine whether Schott's involuntary discharge from CCS was improper. The court reasoned that the ALJ's decision "violated [Schott's] federal right to due process, and federal and state law, by requiring a review by [the Bureau] of her discharge from [CCS], which denied [Schott's] right to a fair hearing with the DHA." The court determined that a review by the Bureau "is not a local level appeal as defined by federal regulations or the

equivalent of a fair hearing as required by law, and the decision by the [ALJ] holding otherwise is inconsistent with federal and state law." Finally, the court awarded Schott attorney fees and costs, pursuant to WIS. STAT. § 814.245, after it determined that the DHS was not "substantially justified" in taking its position in this case. The DHS appeals.

## DISCUSSION

¶13     On appeal, the DHS asks us to reverse the circuit court's decision and affirm the decision of the ALJ.[11] The DHS's arguments center upon the basic premise that the court misunderstood how the DHS "functions under Wisconsin and federal Medicaid regulations," namely that the DHS acts as "essentially" an insurer for Medicaid recipients. According to the DHS, those "insurer decisions are what 'fair hearings' are for." The DHS asserts, however, that "a 'fair hearing' is *not* an opportunity for a Medicaid recipient to review whether a particular provider—here, [NCHC]—has correctly provided care."

¶14     We disagree with DHS's contention that the circuit court misunderstood how DHS functions under the circumstances of this case. The manner in which the DHS characterizes its operation and decision-making is not the gauge by which we determine an individual's rights under the Due Process Clause of the Fourteenth Amendment or interpret statutes or rules. The circumstances in this case demonstrate that NCHC's decision to discharge Schott from the CCS program was not a "provider" decision. The decision was the result

---

[11] We note that on appeal, both Schott and the DHS agree that there should be no exhaustion requirement before the Bureau for CCS participants who are Medicaid recipients. Thus, we will not address further the question of whether the DHS engaged in impermissible rulemaking by requiring Bureau review before holding a fair hearing.

8

of the direct execution of the DHS's own discharge rules by the only entity that the DHS has designated to provide CCS services to Medicaid recipients in the County, and that discharge decision resulted in a complete denial of eligible Medicaid benefits or services. Federal and state law protect Medicaid recipients whose benefits or services are terminated or changed. The DHS, as the single state agency responsible for administering Medicaid services in Wisconsin, is responsible for ensuring that recipients receive those due process rights and protections. Therefore, for the reasons that follow, we affirm the circuit court's order in all respects.

## I. Fair Hearing

¶15 We first address the DHS's assertion that Schott was not entitled to a fair hearing "because the circumstances triggering one were not present." The DHS asks us to affirm the final administrative decision concluding that no fair hearing was available or required. "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." *Hilton ex rel. Pages Homeowners' Ass'n v. DNR*, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166. Pursuant to our review under WIS. STAT. ch. 227, we "shall affirm the agency's action," unless we determine there is "a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief." WIS. STAT. § 227.57(2).

¶16 Here, the facts of this case are undisputed, so our review will address only questions of law—including federal and state statutory and regulatory interpretation. If we conclude "that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action," then we "shall set aside or modify the agency action" or "remand the case to the agency for

9

further action under a correct interpretation of the provision of law." WIS. STAT. § 227.57(5). "When reviewing questions of law decided by an agency, including statutory interpretation, our review is de novo." *DOR v. Microsoft Corp.*, 2019 WI App 62, ¶13, 389 Wis. 2d 350, 936 N.W.2d 160 (citing *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21); § 227.57(11) ("Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law."). However, "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved." Sec. 227.57(10). Nevertheless, "'[d]ue weight' is a matter of persuasion, not deference." *Tetra Tech*, 382 Wis. 2d 496, ¶78.[12]

---

[12] The DHS specifically argues that we "should afford due weight respect to the [DHS's] understanding of how Medicaid and its requirements function." It contends that "the [DHS] is the state agency with specialized knowledge and experience administering Medicaid and its requirements in Wisconsin" because it is the single state agency designated to administer the state plan.

Schott observes, however, that the DHS "touts its 'great deal of experience in administering Medicaid and its requirements' as sufficient for it to enjoy due weight deference," but it "then roots its further legal arguments in a claim that it is only an 'insurer' of Medicaid." According to Schott, the DHS "cannot have it both ways. It cannot be only an 'insurer' free from the responsibilities imposed by its own regulations, and also an expert in administering those regulations." As our supreme court recognized in *Tetra Tech*,

> "due weight" is not a talisman that automatically grants its bearer additional rhetorical power. If an agency brings to court nothing but a rote recitation of its background with the subject matter, it should not expect the statutory directive to give its argument extra heft. The agency should be prepared to explain how its experience, technical competence, and specialized knowledge give its view of the law a significance or perspective unique amongst the parties, and why that background should make the agency's view of the law more persuasive than others.

*Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶79, 382 Wis. 2d 496, 914 N.W.2d 21.

10

¶17    "[S]tatutory interpretation 'begins with the language of the statute,'" and the "language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted).  We interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46.

¶18    We apply this same interpretative framework to administrative code provisions, and we also review interpretations of the administrative code de novo. *Envirologix Corp. v. City of Waukesha*, 192 Wis. 2d 277, 291, 531 N.W.2d 357 (Ct. App. 1995).  "Administrative rules and statutory provisions dealing with the same subject matter are read together and harmonized if possible." *Id.*  "Where a conflict arises between a statute and an administrative rule, the statute prevails." *Grafft v. DNR*, 2000 WI App 187, ¶12, 238 Wis. 2d 750, 618 N.W.2d 897.

¶19    We begin by outlining the legal framework upon which this case rests.  "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Newcap, Inc. v. DHS*, 2018 WI App 40, ¶4, 383 Wis. 2d 515, 916 N.W.2d 173 (citation omitted).  Although "[s]tates voluntarily opt into the federal scheme," by doing so, states "bind themselves to abide by the rules and regulations imposed by the federal government in return for federal funding." *Papa v. DHS*, 2020 WI 66, ¶4, 393 Wis. 2d 1, 946 N.W.2d 17 (citation omitted); *Harris v. McRae*, 448 U.S. 297, 301 (1980) (explaining that a state's participation in Medicaid requires it to comply with federal Medicaid law); 42 U.S.C. § 1396a(a)(1); *see generally* 42 U.S.C. §§ 1396-1396w-5.

¶20    Wisconsin participates in the federal Medicaid program, and the DHS is the "single State agency" that administers and supervises the administration of our state Medicaid plan. WIS. STAT. § 49.45; 42 C.F.R. § 431.10(b). Importantly, the DHS must develop a Medicaid plan with rules that mirror federal Medicaid laws and regulations. 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 431.200, 431.202; *see also* WISCONSIN DEPARTMENT OF HEALTH SERVICES, STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT MEDICAL ASSISTANCE PROGRAM, https://www.dhs.wisconsin.gov/mandatoryreports/mastateplan/pages1-33.pdf (last visited Apr. 24, 2026).

¶21    While the DHS has a host of Medicaid-related responsibilities, as relevant here, the DHS must establish a hearing system that meets certain explicit due process requirements. *See* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200, 431.205, 431.220. Federal law refers to these due process requirements as a "fair hearing." *See* § 1396a(a)(3) (stating that the state plan for Medicaid must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness").

¶22    As relevant here, the fair hearing system must provide for a hearing before "[t]he Medicaid agency"—the DHS—or "[a]n *evidentiary* hearing at the local level, with a right of appeal to" the DHS. *See* 42 C.F.R. § 431.205(b)(1)-(2) (emphasis added). Wisconsin's system for fair hearings is delegated to the DHA. WIS. STAT. § 227.43(1)(bu); WIS. ADMIN. CODE § HA 3.01 (June 2023);[13] WIS.

---

[13]  All references to WIS. ADMIN. CODE ch. HA 3 are to the June 2023 register.

ADMIN. CODE § DHS 104.01(5). Importantly, "[t]he hearing system must meet the due process standards set forth in ***Goldberg v. Kelly***, 397 U.S. 254 (1970)"; "must be accessible to persons who are limited English proficient and persons who have disabilities"; and "must comply with the United States Constitution" and multiple other federal laws. Sec. 431.205(d)-(f); *see also* WIS. ADMIN. CODE §§ HA 3.06, 3.07, 3.08, 3.09. The ***Goldberg*** requirements include timely and adequate notice, the opportunity to present evidence and confront and cross-examine witnesses, the right to retain counsel, the right to a decision by an impartial decisionmaker, and the right to a statement explaining the reasons for the decision. ***Driver v. Housing Auth. of Racine Cnty.***, 2006 WI App 42, ¶13, 289 Wis. 2d 727, 713 N.W.2d 670; ***Goldberg***, 397 U.S. at 267-71.

¶23 The DHS "must grant an opportunity for" a "fair hearing" to an individual when, as relevant to this case, "*the agency* has taken an *action* erroneously, denied his or her claim for eligibility or for covered benefits or services, or issued a determination of an individual's liability, or has not acted upon the claim with reasonable promptness," including "[a]n initial or subsequent decision regarding eligibility," "[a] change in the amount or type of benefits or services," or "[a] prior authorization decision." *See* 42 C.F.R. § 431.220(a)(1) (emphasis added); WIS. ADMIN. CODE § HA 3.03. The Code of Federal Regulations defines an "[a]ction," as relevant to this case, to mean "[a] termination, suspension of, or reduction in covered benefits or services, including benefits or services for which there is a current approved prior authorization." 42 C.F.R. § 431.201. Stated clearly, when an individual's Medicaid benefits or services are terminated, suspended, or reduced by the agency, that person is

13

entitled to due process, including the right to a fair hearing.[14]   42 C.F.R. §§ 431.200, 431.205; WIS. ADMIN. CODE § DHS 104.01(5)(b);[15] WIS. ADMIN. CODE §§ HA 3.01(2), (3)(b), 3.03(1)(c).

¶24    To resolve this case, then, we must determine (1) whether NCHC's decision to discharge Schott was a decision of "the agency"—i.e., state action— and (2) whether that decision resulted in "[a] termination, suspension of, or reduction in covered [Medicaid] benefits or services." *See* 42 C.F.R. §§ 431.201, 431.220(a)(1); WIS. ADMIN. CODE § DHS 104.01(5)(b).   If we answer both questions in the affirmative, Schott is entitled to proper notice of her rights and a fair hearing to contest her involuntary discharge from CCS.  *See* 42 C.F.R. §§ 431.202-431.211, 431.220; § DHS 104.01(5); WIS. ADMIN. CODE §§ HA 3.04, 3.05.

---

[14] Pursuant to the Code of Federal Regulations, the Medicaid recipient must receive notice of the proposed action; a clear description of the intended action and a statement of the reasons and the legal basis supporting that action; an explanation of the right to request a fair hearing; an explanation of the circumstances under which Medicaid benefits will continue if a hearing is requested; and sufficient time to file an appeal before the effective date. *See* 42 C.F.R. §§ 431.205-431.211, 431.220.

[15] WISCONSIN ADMIN. CODE § DHS 104.01(5)(b) provides as follows:

> The purpose of the fair hearing is to allow a recipient to appeal department actions which result in the denial, discontinuation, termination, suspension or reduction of the recipient's [Medicaid] benefits.  The fair hearing process is not intended for recipients who wish to lodge complaints against providers concerning quality of services received, nor is it intended for recipients who wish to institute legal proceedings against providers.  Recipients' complaints about quality of care should be lodged with the appropriate channels established for this purpose, to include but not limited to provider peer review organizations, consumer advocacy organizations, regulatory agencies and the courts.

*A. Decision of the agency*

¶25    The DHS argues that we should "reject Schott and the circuit court's reasoning that [NCHC], when making treatment decisions about Schott, was somehow acting on behalf of the Department." According to the DHS, it "plays no role in such provider-patient treatment decisions and lacks authority to be involved." The basis of the DHS's position in this case is its belief that, within the Medicaid construct, it serves as the Medicaid insurer and that fair hearings are required to review the decisions it makes in that role. Thus, the DHS contends that "the hearings can be used to challenge eligibility determinations and coverage and medical necessity decisions, not individual choices about care made by a provider, like a doctor or, here, a CCS provider."

¶26    We reject the DHS's attempt to distance itself from NCHC's decision. By operation of law, the DHS bears responsibility for NCHC's actions involving Medicaid recipients, and, therefore, NCHC's decision to involuntarily discharge Schott pursuant to the rules promulgated by the DHS is properly deemed an act of "the agency." *See* 42 C.F.R. § 431.220(a)(1). The DHS has delegated the implementation and execution of CCS to the county departments.[16] WIS. STAT. § 49.45(30e)(a)2. (stating that CCS services are reimbursable provided "[t]he county in which the individual resides elects to make the services … available in the county through the [Medicaid] program"); WIS. ADMIN. CODE §§ DHS 36.03(9) (defining "county department" as "a county

---

[16] Wisconsin is not required, pursuant to federal law or regulation, to provide "psychosocial services" to Medicaid recipients, *see* 42 C.F.R. § 440.225, but the state has opted to do so within its Medicaid plan, *see* WIS. STAT. §§ 49.45(30e), 49.46(2)(b)6.Lm.; WIS. ADMIN. CODE § DHS 36.01.

department of human services" under WIS. STAT. § 46.23), 36.04(1) ("A county department or tribe seeking to operate a certified [CCS] program shall apply to the [DHS] for certification on an application form provided by the [DHS].").[17] Nevertheless, the DHS retains significant oversight of CCS programs. The DHS promulgates the rules regarding "[s]tandards for determining whether an individual is eligible under [§ 49.45(30e)](a)3."; "[t]he scope of psychosocial services that may be provided under [WIS. STAT. §] 49.46(2)(b)6.Lm."; "[r]equirements for certification of [CCS] programs"; and "[a]ny other conditions for coverage of [CCS] under the [Medicaid] Program." Sec. 49.45(30e)(b); *see generally* WIS. ADMIN. CODE ch. DHS 36.

¶27    As relevant here, WIS. ADMIN. CODE § DHS 36.17(5) outlines the procedures by which an individual may be discharged from CCS. Generally, "[d]ischarge from the CCS shall be based on the discharge criteria in the service plan of the consumer unless any one of the following" situations apply:

> 1. The consumer no longer wants psychosocial rehabilitation services.
>
> 2. The whereabouts of the consumer are unknown for at least 3 months despite diligent efforts to locate the consumer.
>
> 3. The consumer refuses services from the CCS for at least 3 months despite diligent outreach efforts to engage the consumer.
>
> 4. The consumer enters a long-term care facility for medical reasons and is unlikely to return to community living.

---

[17] Counties may also elect to provide services through a regional, multi-county model based on criteria specified by the DHS. WIS. STAT. § 49.45(30e)(d). Some counties, either individually or as a regional group, further delegate CCS implementation to another entity. *See* § 49.45(30e); WIS. ADMIN. CODE § DHS 36.07(3).

5. The consumer is deceased.

6. Psychosocial rehabilitation services are no longer needed.

Sec. DHS 36.17(5)(a)1.-6.

¶28 With that background in mind, the question is whether NCHC's involuntary discharge decision qualified, under federal and state Medicaid law, as an agency decision. In order to demonstrate that the DHS is responsible for the specific conduct of which she complains, first, Schott "must … show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *See* **Blum v. Yaretsky**, 457 U.S. 991, 1004 (1982) (citation omitted). "[T]he mere fact that a business is subject to state regulation," however, "does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." **Id.** (citation omitted). Second, the State must have "exercised coercive power or … provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." **Id.** "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." **Id.** at 1004-05. Finally, "the required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" **Id.** at 1005 (citation omitted).

¶29 Analyzed in light of these principles, the "close nexus" between NCHC and the DHS is clear: NCHC has been tasked with executing all of the DHS's duties under federal and state law to implement and operate CCS programs in the County. As noted above, CCS is defined as "a county-wide or tribal community-based psychosocial rehabilitation program *that is operated by a county*

17

*department* or tribe to provide or arrange for the provision of psychosocial rehabilitation services." WIS. ADMIN. CODE § DHS 36.03(4) (emphasis added). Lincoln County, together with two other counties, has delegated responsibility for operating the entire CCS program in those counties to NCHC. Thus, we agree with Schott that "NCHC is not like one of the 79 physical therapist 'providers' that offer Medicaid-covered services in Lincoln County, or the 119 nurse practitioners." As Schott argues, with the DHS's regulatory oversight, NCHC makes eligibility determinations with respect to CCS, enrolls participants, assesses participant needs, creates and implements service plans, requests reimbursement from the DHS, and informs consumers of their rights upon discharge. NCHC is not merely a provider.

¶30 Furthermore, NCHC's discharge decision in this case was also not merely a provider decision. According to the record, the notice stated that Schott was discharged from NCHC because "[w]e have not been able to establish a treatment plan"—what the administrative code calls a "service plan"—"within the timeframe allowed for the abbreviated assessment." *See* WIS. ADMIN. CODE § DHS 36.17(2), (2m), (5); *see also* WIS. ADMIN. CODE §§ DHS 36.16 (outlining the assessment process), 36.03(27) (defining "[s]ervice plan" to mean "a written plan of psychosocial services to be provided or arranged for a consumer that is based on an individualized assessment of the consumer"). We agree, based on the plain language of the administrative code, with Schott's argument before the ALJ that the failure to establish a treatment plan "alone is not a basis for discharge" under § DHS 36.17(5)(a). Schott noted before the ALJ, however, that in its "Final Report," "NCHC claimed that [Schott's] 'involuntary discharge from CCS is

18

consistent with #3 of the above discharge criteria,' and referenced" § DHS 36.17(5)(a)3.[18] *See supra* ¶27.

¶31 Thus, NCHC's discharge decision resulted from the direct execution of the DHS's own discharge rules. The discharge decision was not based on medical judgment, was not based on NCHC's own policies or procedures, and was not based on criteria established in a service plan. The decision was the execution of a rule promulgated by the DHS concerning how CCS programs are to operate. *See Blum*, 457 U.S. at 1012 (White, J., concurring) (explaining that to "satisfy[] the state-action requirement," "respondents must show that the transfer or discharge is made *on the basis of* some rule of decision for which the state is responsible" (emphasis added)). Therefore, the "close nexus" between the DHS and NCHC establishes that NCHC is a state actor and that its decision is properly considered an act of the DHS. *See id.* at 1004.

¶32 The DHS disputes this conclusion, however, arguing that *Blum* supports its position.[19] In *Blum*, Medicaid participants were patients in a nursing home, and the nursing home's committee of physicians, "whose functions include[d] periodically assessing whether each patient [was] receiving the

---

[18] It does not appear that NCHC argued to the contrary before the ALJ, and on appeal, the DHS does not assert that Schott was discharged under any other provision or, specifically, under her treatment/service plan, as no such plan existed. Furthermore, the DHS does not allege that Schott's discharge was based on policies or procedures developed directly by NCHC.

[19] The DHS also relies upon general agency principles in support of its argument, stating that there was no "manifestation by the principal to the agent that the agent may act on his [or her] account, and consent by the agent so to act." *See State v. Timblin*, 2002 WI App 304, ¶27, 259 Wis. 2d 299, 657 N.W.2d 89 (citation omitted). We conclude that general agency principles are considered under the standard discussed in *Blum v. Yaretsky*, 457 U.S. 991 (1982), which is applicable here. Therefore, we do not further address the DHS's arguments concerning general agency law.

19

appropriate level of care, and thus whether the patient's continued stay in the facility [was] justified," determined that the patients "did not need the care they were receiving and should be transferred to a lower level of care." *Id.* at 994-95. In response, the patients commenced a class action lawsuit, arguing that "the defendants had not afforded them adequate notice either of [the committee's] decisions and the reasons supporting them or of their right to an administrative hearing to challenge those decisions" in violation of the Due Process Clause. *Id.* at 996.

¶33     The United States Supreme Court observed that the patients were "not challenging particular state regulations or procedures, and their arguments concede[d] that the decision to discharge or transfer a patient originates not with state officials, but with nursing homes that are privately owned and operated." *Id.* at 1003. Therefore, the Court explained, the patients sought "to hold state officials liable for the actions of private parties." *Id.* The Court rejected that request, stating that "[t]he decisions about which respondents complain [were] made by physicians and nursing home administrators, all of whom are concededly private parties." *Id.* at 1005. Further, the Court recognized that "[t]here is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care." *Id.*

¶34     The material facts in *Blum* are not on par with the situation here, and as a result, the Court's reasoning in *Blum* provides support for the opposite conclusion in this case—namely that NCHC is a state actor and its decision is properly considered an act of the DHS. The *Blum* Court did not conclude there was a "close nexus" in that case because it determined that the physician committee's decisions were essentially the decisions of a provider because the

decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards *that are not established by the State*" and were not decisions that the state regulated. *Id.* at 1008 (emphasis added). Further, the Court rejected the patients' arguments that regulations imposed a penalty based on these medical judgments and reasoned that "those regulations themselves do not dictate the decision to discharge or transfer in a particular case." *Id.* at 1009-10.

¶35 Here, as outlined above, NCHC's decision to discharge Schott from CCS was not based on medical judgment, as in *Blum*. Instead, DHS-created rules "dictate[d] the decision to discharge" Schott in this case, based on either her failure to complete a service plan or her alleged refusal of service. *See id.*; WIS. ADMIN. CODE § DHS 36.17(5)(a). Therefore, like *Blum*'s "patient care assessment forms designed by the State," *see Blum*, 457 U.S. at 1008, the DHS's rules required NCHC to complete an assessment and create a service plan pursuant to WIS. ADMIN. CODE §§ DHS 36.16 and 36.17(2). Unlike in *Blum*, however, these rules *do* "require [NCHC] to rely on the [assessment and service plan] in making discharge … decisions." *See Blum*, 457 U.S. at 1008. Accordingly, the decision to discharge Schott was based on standards established by the DHS to administer CCS programs; therefore, NCHC was standing in the shoes of the DHS when it made its decision to discharge Schott.

¶36 The DHS also challenges Schott's reliance on *J.K. ex rel. R.K. v. Dillenberg*, 836 F. Supp. 694 (D. Ariz. 1993). In that case, the question was "the sufficiency of behavioral health services" provided to children under Arizona's Medicaid plan. *Id.* at 695-96. Like the DHS, the Arizona Department of Health Services contracted out its behavioral health services for Medicaid-covered children to a regional behavioral health program. *See id.* at 697. At issue was the regional program's "new policy" whereby "children residing in residential

treatment centers or therapeutic group homes would be discharged from treatment in ninety days." *Id.*

¶37 The United States District Court for the District of Arizona distinguished the case from *Blum*, noting that the "[p]laintiffs herein are not complaining about the actions of a private provider but of a private entity that has been assigned the entire responsibility for a state-created service" "as its means of carrying out its public duties." *J.K.*, 836 F. Supp. at 698. Thus, the district court determined that "the actions undertaken by [the regional program], to the extent that [they] are later proven to be an impermissible reduction of services, were effected on behalf of the government and constitute state action." *Id.* at 698-99.

¶38 The DHS disputes the application of *J.K.* to the facts of this case because, it claims, the *J.K.* court provided "little analysis" for its departure from *Blum*. It further argues that the DHS "has not delegated its 'mandated health care duties' to any entity and it likewise has no contract so delegating" because the DHS "has no duty to offer CCS services that … is, in turn, being passed off to another entity." Again, we disagree with the DHS's characterization.

¶39 As noted above, Wisconsin has opted to include "psychosocial services" provided by a CCS as an "optional" benefit for Medicaid recipients. *See* 42 C.F.R. §§ 440.210 (required services for categorically needy), 440.220 (required services for medically needy), 440.225 (optional services); WIS. STAT. §§ 49.45(30e)(a)2., 49.46(2)(b)6.Lm.; WIS. ADMIN. CODE § DHS 36.01; *see also* 42 C.F.R. §§ 440.130(d), 440.140, 440.160, 440.60. Thus, the CCS programs are executing state responsibilities under federal Medicaid law, and, according to the rules established by the DHS, operation of CCS programs is delegated to the "county department" but overseen by the DHS. *See* WIS. ADMIN. CODE

§§ DHS 36.03(4), (9), 36.04(1); WIS. STAT. § 51.42(7). The County has delegated the operation of *all* CCS services to NCHC. By operating in this capacity, NCHC is not merely a private actor doing business with the DHS. *See **J.K.***, 836 F. Supp. at 698; *see also* 42 U.S.C. § 1396u-2; 42 C.F.R. § 431.10(c).

¶40 Any argument by the DHS that it has not "delegated" the CCS program because counties *choose* to offer it is irrelevant to an individual's right to a fair hearing. The DHS cannot legally distance itself from NCHC's decisions. If an authorized administrator—whether that be the county department or a private entity that operates the CCS program for the county—takes an "action" involving a Medicaid recipient, that "action" triggers due process protections. *See* 42 C.F.R. § 431.220(a). Because the DHS certifies and funds these programs, in part, through Medicaid, the DHS is responsible, regardless of which entity physically takes the action. And that legal link remains even though not all CCS enrollees are Medicaid recipients. Due process cannot be ignored because, as the DHS argues, the CCS services do not "apply exclusively to Medicaid recipients."[20]

---

[20] In its reply brief, the DHS cites *Saint Anthony Hospital v. Whitehorn*, 132 F.4th 962 (7th Cir. 2025), *J.K. ex rel. R.K. v. Dillenberg*, 836 F. Supp. 694 (D. Ariz. 1993), and *Catanzano ex rel. Catanzano v. Wing*, 103 F.3d 223 (2d Cir. 1996), as examples where the state Medicaid agency had delegated its duties. The DHS argues that these cases support its position that "CCS programs under Wisconsin law were not created to serve Medicaid recipients specifically and are not administered by the [DHS]," arguing that these cases "are apples-to-oranges here." Nevertheless, the DHS has not identified any legal authority suggesting that an entity's decision can never constitute "state action" under *Blum* if the entity has been delegated duties beyond those related to Medicaid recipients. It strains credulity that where an entity is delegated *more power* it also holds *less responsibility*. Regardless of an entity's specific role—for example, as a managed-care organization or exclusively devoted to providing a Medicaid service, *see Whitehorn*, 132 F.4th at 965; *Catanzano*, 103 F.3d at 225-26; *J.K.*, 836 F. Supp. at 695-96—if the entity has assumed the responsibility for administering the state's duties under federal Medicaid law, its decisions that result in adverse actions for recipients are subject to challenge by the fair hearing procedures.

¶41    We are also persuaded by the *J.K.* court's discussion of the "devastating" public policy implications if state agencies are not held responsible. *See J.K.*, 836 F. Supp. at 699.  As the court explained,

> It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity.  The law demands that the designated single state Medicaid agency must oversee and remain accountable for uniform statewide utilization review procedures conforming to bona fide standards of medical necessity.

*Id.* (citations omitted).  We agree with Schott that "[w]hen an optional service is added to the state's Medicaid plan, that optional service becomes subject to the requirements of federal law just as if it were a mandatory service."  *See Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006) ("Once the state offers an optional service, it must comply with all federal statutory and regulatory mandates."); *Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997) ("[E]ven when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law.").  Accordingly, the DHS cannot contract away its obligations to Medicaid recipients; therefore, NCHC's decision to involuntarily discharge Schott pursuant to a DHS-promulgated rule is properly considered a decision of the agency.

### B.  Action of the agency

¶42    Now that we have determined that NCHC's decision qualified as an agency decision under federal Medicaid law, we must determine whether that decision qualified as an "action" for purposes of federal fair hearing requirements. *See* 42 C.F.R. §§ 431.201, 431.220.  As noted above, and as relevant to this case, Medicaid recipients are entitled to a fair hearing to challenge "[a] termination, suspension of, or reduction in covered [Medicaid] benefits or services" prior to

that service's termination. 42 C.F.R. §§ 431.201, 431.205, 431.220(a)(1); WIS. ADMIN. CODE § HA 3.03(1)(c); WIS. ADMIN. CODE § DHS 104.01(5)(b) ("The purpose of the fair hearing is to allow a recipient to appeal department actions which result in the denial, discontinuation, termination, suspension or reduction of the recipient's [Medicaid] benefits."); *see also* WIS. ADMIN. CODE §§ DHS 36.17(5)(am)3., 36.19(1)(c). When the "agency has taken an action" that a consumer believes is erroneous, the DHS, as the "single State agency" responsible for administering or supervising the administration of the Medicaid plan in Wisconsin, must ensure compliance with all of the relevant federal and state laws and regulations. *See* 42 C.F.R. §§ 431.10(b), 431.220(a)(1); *see also* 42 U.S.C. § 1396a(a)(3); *Harris*, 448 U.S. at 301.

¶43 Here, we conclude that NCHC's act of involuntarily discharging Schott from the CCS program resulted in a termination of a covered Medicaid benefit or service, and, therefore, Schott was entitled to a fair hearing to challenge that termination. Again, it is undisputed that NCHC operates the only CCS program in the County (and in two other counties). This monopoly is by design. As Schott argues, "[t]he regulations guiding the CCS program, created by the [DHS] itself, do not allow [Schott] the luxury to shop for other CCS 'providers.'" Given the nature of the services provided by NCHC, and the lack of any other CCS providers in the County, Schott's involuntary discharge by NCHC resulted in her inability to access *any* CCS services, which qualifies as a termination— meaning "[t]he act of ending something," *see Termination*, BLACK'S LAW DICTIONARY (12th ed. 2024)—or at the very least a reduction of Medicaid benefits or services, and it effectively resulted in a denial of her claim for mental health services through Medicaid. *See* 42 C.F.R. §§ 431.201, 431.220(a)(1); WIS.

ADMIN. CODE § DHS 104.01(5)(b). This complete denial of eligible services entitled Schott to a fair hearing to challenge this adverse action.

¶44 At the time Schott was involuntarily discharged by NCHC, two sections of WIS. ADMIN. CODE ch. DHS 36 recognized Medicaid recipients' rights to fair hearing procedures, distinct from those of "all other consumers."[21] *See* WIS. ADMIN. CODE §§ DHS 36.17(5)(am)3., 36.19(1). As relevant here, § DHS 36.17(5)(am) provided as follows:

---

[21] Earlier this year, the DHS amended portions of WIS. ADMIN. CODE ch. DHS 36, including WIS. ADMIN. CODE §§ DHS 36.17(5)(am) and 36.19(1) (Feb. 2026), pursuant to its "agency review of rules and enactments on a biennial basis." *Clearinghouse Rule 25-055*, 842B WIS. ADMIN. REG., 3 (Feb. 23, 2026), https://docs.legis.wisconsin.gov/code/register/2026/842b/register/final/cr_25_055_rule_text/cr_25_055_rule_text.pdf. According to the DHS, the amendments were made because

> [§§] DHS 36.17(5)(am) and 36.19(1) contain provisions that are obsolete and in conflict because they refer to fair hearings that are inconsistent with [WIS. ADMIN. CODE §] DHS 104.01(5). These references appear to apply to clinical decisions to discharge an individual from [CCS], but the fair hearing process is not intended for recipients who wish to lodge complaints against providers concerning quality of services received or discharge from a program. *See* [§] DHS 104.01(5)(b). These provisions should be updated accordingly.

*Id.* at 7.

Therefore, the current version of WIS. ADMIN. CODE § DHS 36.17(5)(am) (Feb. 2026) no longer references Medicaid or the fair hearing procedures and provides as follows:

> (am) When a consumer is discharged from the CCS program, the consumer shall be given written notice of the discharge. The notice shall include all of the following:
>
> 1. A copy of the discharge summary developed under par. (b).
>
> 2. Written procedures on how to re-apply for CCS services.
>
> 3. Information on how the consumer who is involuntarily discharged from the CCS program can submit to the department a written request for a review of the discharge.

(am) When a consumer is discharged from the CCS program, the consumer shall be given written notice of the discharge. The notice shall include all of the following:

1. A copy of the discharge summary developed under par. (b).

2. Written procedures on how to re-apply for CCS services.

3. If a consumer is involuntarily discharged from the CCS program and the consumer receives Medical Assistance, the fair hearing procedures prescribed in [WIS. ADMIN. CODE §] DHS 104.01(5). For all other consumers, information on how the consumer can submit a written request for a review of the discharge to the department.

¶45    On appeal, the DHS "acknowledges" that this provision of the administrative code "could, at first blush, appear to create tension," but it argues that "read in context, that notice provision can be applied in harmony with the fair hearing provisions." According to the DHS, the "cross reference" to WIS. ADMIN. CODE § DHS 104.01(5) within WIS. ADMIN. CODE § DHS 36.17(5)(am) "points to something specific: to 'department' actions concerning" changes in Medicaid benefits. "In other words," argues the DHS, "the notice provision provides for broad notice where it *could* be the case that a fair hearing is required." Here, however, because the DHS contends this involuntary discharge was a provider decision, it contends that "the fair hearing provision would not apply."

¶46    Regardless of the DHS's attempt to complicate straightforward regulatory language, the significant point is that the prior version of WIS. ADMIN. CODE § DHS 36.17(5)(am) recognized that CCS participants who receive Medicaid benefits have due process rights unique to their status as Medicaid recipients. The DHS's act of removing the fair hearing language from the administrative code does nothing to alter Medicaid law. Federal law still requires the DHS to provide a fair hearing to a Medicaid recipient "who requests it because he or she believes the agency has taken an action" that results in "termination,

27

suspension of, or reduction in covered benefits or services" "erroneously." 42 C.F.R. §§ 431.201, 431.220(a)(1); *see also* WIS. ADMIN. CODE § DHS 104.01(5)(b); WIS. ADMIN. CODE § HA 3.03(1)(c), (4).[22]

¶47 In summary, NCHC decided to discharge Schott from the CCS program as a state actor on behalf of the DHS and pursuant to a DHS-promulgated rule. Schott's involuntary discharge resulted in the termination of her CCS benefits with no other way to receive the covered service. Schott is therefore entitled to a fair hearing to review that decision.

## II. Fees and costs

¶48 Finally, the DHS asks us to reverse the circuit court's award of attorney fees and costs to Schott under WIS. STAT. § 227.485. Pursuant to § 227.485(3), the prevailing party "shall" be awarded "the costs incurred in connection with the contested case, unless … the state agency which is the losing party was substantially justified in taking its position or … special circumstances exist that would make the award unjust."[23] The circuit court specifically found that there was an absence of authority in federal or state law to support the DHS's position in this case and that the DHS had "elected to advance" a policy argument "that is simply a parade of horribles." As a result, the court concluded that the DHS was not substantially justified in taking its position.

---

[22] We also note that in the alternative to a fair hearing before the DHS, the DHS could provide for a local level intermediary review. *See* 42 C.F.R. § 431.205(b). However, the current purported local level appeal to the Bureau does not satisfy the federal regulatory requirements because it does not provide for an *evidentiary* hearing with proper due process protections. *See id.*

[23] This case does not involve special circumstances.

¶49    "'Substantially justified' means having a reasonable basis in law and fact." WIS. STAT. § 227.485(2)(f).    Therefore, "[t]o satisfy its burden the government must demonstrate (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced." *Sheely v. DHSS*, 150 Wis. 2d 320, 337, 442 N.W.2d 1 (1989) (citation omitted). Nevertheless, "[l]osing a case does not raise the presumption that the agency was not substantially justified," and "advancing a 'novel but credible extension or interpretation of the law'" is also not "grounds for finding a position lacking substantial justification." *Id.* at 338 (citation omitted).  We apply the erroneous exercise of discretion standard when reviewing a circuit court's "substantially justified" determination. *See id.* at 337.

¶50    We conclude that the circuit court did not erroneously exercise its discretion when it awarded Schott attorney fees and costs.  As the facts in this case were not at issue, we look only to whether the DHS has met its burden to prove that there was "a reasonable basis in law for the theory propounded" and "a reasonable connection between the facts alleged and the legal theory advanced." *See id.*  As explained above, the DHS's position in this case is directly contrary to unambiguous federal and state Medicaid law and ignores the consequences of its delegation of authority to NCHC for all CCS services in the County. Significantly, the result of the DHS's unsupported position is the denial of due process rights to a vulnerable population—those suffering with mental health and/or substance-use concerns that are also eligible for Medicaid.

¶51    Accordingly, we cannot conclude that the circuit court erroneously exercised its discretion by determining that the DHS was not substantially justified in taking its position.  We affirm the court's award of fees and costs.

*By the Court.*—Order affirmed.

Recommended for publication in the official reports.